GREGORY, Circuit Judge,
dissenting:
As a court of appeals, we have a “heightened responsibility, to insist, even at the risk of delay, on having the fact-finding process carried out properly at the level intended rather than to assume, even indirectly, a fact-finding role.” Lewis v. Bloomsburg Mills, Inc., 773 F.2d 561, 577 (4th Cir.1985). In the present case, my colleagues transgress our role by deciding *309 a factual question never presented to the district court.
In Baze v. Rees, the Supreme Court issued an extremely narrow holding, “concluding that Kentucky’s procedure is consistent with the Eighth Amendment.” — U.S. -, 128 S.Ct. 1520, 1538, 170 L.Ed.2d 420 (2008) (plurality opinion) (emphasis added). Thus, despite the myriad other questions addressed by the majority, whether Virginia’s protocol is in fact substantially similar to the procedure upheld in Baze is the singular issue at hand. Although this legal determination is inextricably tied to complex factual issues that have never been addressed by the district court in light of Baze, the majority remarkably concludes that “Virginia’s protocol for lethal injection is substantially similar to that approved by the Supreme Court.” (Majority Op. 308.) Because I cannot condone usurping the district court’s unique ability to make factual findings in the first instance, I must dissent.
The barbiturate sodium thiopental plays a crucial role in ensuring the humanity of the execution process. According to the Baze Court, “[t]he proper administration of the first drug [sodium thiopental] ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs.” Baze, 128 S.Ct. at 1527. Additionally, the plurality explained that pancuronium bromide and potassium chloride, when given absent a proper dose of sodium thiopental, create “a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuro-nium bromide and pain from the injection of potassium chloride.” Id. at 1533. As such, Kentucky’s written protocol regarding the administration of sodium thiopental is essential to the Baze holding. Virginia’s protocol significantly differs with respect to the safeguards Kentucky takes to guarantee the proper administration of that essential first drug. With all due respect, the majority’s conclusion otherwise is simply wrong.
First, the initial dose of sodium thiopen-tal is different: Kentucky administers three grams of sodium thiopental, whereas Virginia uses only two grams. Second, Virginia employs a so-called “rapid flow” technique, under which the lethal chemicals and saline flushes are administered quickly one after the other without pause. Conversely, Kentucky’s written protocol provides a brief pause between the first and second drugs to ensure that the inmate is sedated properly.[1] Third, in Kentucky, if the inmate is not adequately sedated after the administration of the first three grams of sodium thiopental to the primary IV site, a second three grams of sodium thiopental is administered to the alternate IV site. Id. at 1528. Conversely, Virginia has no such procedure to ensure that the inmate is properly sedated before proceeding to the second and third drugs. In fact, Virginia does not even administer a second dose of sodium thio-pental when the first round of injections fails to kill the inmate. Virginia’s alternate line allows only for the administration of additional pancuronium bromide and potassium chloride.[2] Thus, Kentucky’s pro *310 tocol provides up to three times as much sodium thiopental as Virginia.
The majority, however, completely glosses over these significant distinctions, flippantly referring to them as “minor variations” and calling Virginia’s procedure “largely identical to that of Kentucky.” (Majority Op. 299.) With respect to the amount of sodium thiopental, the majority states that “the State of Kentucky’s lethal injection method ... also utilized a three-drug combination of 3 grams thiopental, 50 milligrams of pancuronium bromide, and 240 milliequivalents of potassium chloride.” (Majority Op. 298 (emphasis added).) This statement is misleading, as it implies that both Virginia and Kentucky administer three grams of sodium thiopental, which quite clearly is not the case.
Additionally, the majority misconstrues the role of sodium thiopental altogether, stating that “there has not been a single incident in which the thiopental failed to render an inmate unconscious.” (Majority Op. 304.) Thus, the majority fails to understand that the purpose of sodium thio-pental is not merely to render an inmate unconscious but to ensure that the inmate does not experience any pain associated with the administration of the second and third drugs. Moreover, the majority reveals further misunderstanding, writing that “[tjhere is no evidence of any inmate speaking, crying out, writhing in pain, gasping for breath or otherwise moving during the execution process.” (Majority Op. 304.) However, even absent a sufficient dose of sodium thiopental, an inmate would be unable to speak, cry out, writhe, gasp, or otherwise move. Under Virginia’s “rapid flow” method, the pancuronium bromide would have been administered moments after the sodium thiopental, rendering the inmate paralyzed and incapable of communicating. Thus, the fact that inmates do not move about or express pain speaks only to the success of the pancuro-nium bromide and indicates nothing about whether the sodium thiopental has served its purpose in dulling the inmates’ pain.
Furthermore, the majority dispenses with Virginia’s failure to provide a second administration of sodium thiopental simply by stating that
[tjhere is ... no evidence that the execution team would be prohibited by the checklist from giving the second dose of thiopental should either the Department officials or an execution team member observe a problem with the initial administration of the drug or observe an inmate failing to lose or regaining consciousness.
(Majority Op. 306 (emphasis in original).) Failing to prohibit something is quite different than explicitly providing for it. The plurality in Baze explained that the risk associated with lethal injection “is already attenuated, given the steps Kentucky has taken to ensure the proper administration of the first drug.” Baze, 128 S.Ct. at 1536 (emphasis added). Thus, it was the explicit measures Kentucky took to ensure the proper administration of sodium thiopental that made the protocol in Baze constitutional. Nothing in Virginia’s protocol provides for an additional amount of sodium thiopental. Something as serious as the humane extinguishing of a human life, which is required under the Constitution, demands deliberate care and precision. We should not be left to conjuring additional, nonexistent safeguards from whole cloth and then thinly justifying them with *311 the argument that they are not prohibited. Despite what the majority might argue, failing to forbid an additional administration of sodium thiopental is not an unspoken authorization to administer it as needed.
Unlike the majority, I simply cannot read Baze to condone any combination of sodium thiopental, pancuronium bromide, and potassium chloride. Merely using identical drugs, but in varying amounts and at varying times in the procedure, hardly yields “largely identical” lethal injection protocols. A cocktail of the very same three drugs has the potential to end in quiet, painless death or excruciating, silent torture depending upon how those drugs are administered. Furthermore, which of those outcomes will result can only be determined by assessing the written protocol as it exists, like the Supreme Court in Baze, not by grafting any number of new measures onto the current protocol based solely on the flawed logic that those procedures are not explicitly prohibited. Given the centrality of sodium thiopental to the constitutionality of Kentucky’s procedure, it is clear that Virginia’s use of a mere third of the sodium thiopental allowed in Kentucky, coupled with Virginia’s failure to readminister sodium thiopental with the second round of pancuronium bromide and potassium chloride, raises genuine issues of material fact that mandate a remand to the district court for additional fact-finding. The majority, however, does not agree.
After concluding that two grams of sodium thiopental is adequate, the majority appears to take further solace in the facts that pancuronium bromide on its own “would result in the cessation of respiration within three minutes or less, causing the inmate to suffocate and die” and that potassium chloride stops the heart after one full circulation, something that usually takes a minute or less in a normal person, yet potentially longer in someone sedated by sodium thiopental. (Majority Op. 303.) Although Emmett points to evidence that certain inmates may not have been adequately sedated, the majority notes that in most of those cases “the inmate was still pronounced dead within five minutes or less.” (Majority Op. 304.) No one contests the lethal effectiveness of Virginia’s protocol. So far as ensuring death, the current procedure is one-hundred percent effective: no inmates have survived execution. The question Emmett poses, conversely, is whether Virginia’s lethal injection protocol creates a substantial risk of severe pain, which Baze clearly prohibits. From the comfort of a judicial bench, five minutes may pass quickly and without note. However, when in the course of five minutes a lethal chemical navigates a person’s veins rendering him incapable of breathing, let alone crying out in anguish, followed by a second deadly chemical — a salt — that excruciatingly scorches the membrane of every blood vessel it touches as it travels the length of his circulatory system until finally stopping his heart, that same five minutes becomes a drastically longer period of time. By providing less sodium thiopental in the first set of chemicals and none in the second, Virginia fails to employ the same safeguards against this horrific and terrifying outcome as used in Kentucky. The district court, however, has never had a chance to address the factual implications of these significant disparities.
In short, the majority effectively grants summary judgment on a crucial issue never presented to the district court: whether material differences exist between Kentucky’s and Virginia’s protocols. The mere fact that both states use the same three chemicals to execute inmates does little to establish that the protocols are substantially similar, let alone “largely *312 identical,” when such glaring differences exist as to how the executioner administers sodium thiopental, the single drug vital to the procedure’s humanity. Recently, the Supreme Court observed that “[w]hen the law punishes by death, it risks its own sudden descent into brutality....” Kennedy v. Louisiana, — U.S.-, 128 S.Ct. 2641, 2650, 171 L.Ed.2d 525 (2008). And failing to remand to the district court for further fact-finding sends us tumbling faster into that abyss.

. Kentucky’s protocol notes in writing that "[i]f it appears to the Warden That [sic] the condemned is not unconscious within 60 seconds to his command to 'proceed', the Warden shall stop the flow of Sodium Thiopental in the primary site and order that the backup IV be used with a new flow of Sodium Thio-pental.” Baze, 128 S.Ct. at 1522 (emphasis added).

. According to Emmett, the failure to include a second administration of sodium thiopental is a procedural idiosyncrasy unique to Virginia. (Appellant's Supp. Br. 17 ("Counsel is unaware of any other jurisdiction that ex *310 cludes thiopental from a baclc-up dose as part of its protocol, and some jurisdictions have added the back-up dose in response to concerns that omitting it increases the danger of inhumane executions.”).)