BOYCE F. MARTIN, JR., Circuit Judge,
dissenting.
Michael Beuke seeks a stay of his execution on the basis that an anti-seizure medication that he has been taking for some time would interact negatively and painfully with one of the drugs in the Plan B intramuscular injection, should his executioners encounter difficulty administering the State of Ohio’s new one-drug injection protocol. At a hearing before the district court, Beuke presented evidence that there was a concrete possibility that such a reaction could occur, but the district court found that he had failed to prove that it was “likely” to occur. I would reverse and grant the stay.
******
This is another in the long line of cases that have developed in the short period since the State of Ohio drastically altered its lethal injection protocol in November 2009. Though, as far as I know, Ohio has not yet encountered problems in carrying-out executions under its latest protocol, the fact remains that Ohio is blazing a very new trail. Only time will tell if the changed protocol actually addressed the problems alleged to have surrounded the prior three-drug method of execution.
But that’s the point. Only time will tell. Under Cooey and its progeny, inmates facing execution must show a likelihood[1] that use of this protocol will result in “ ‘needless suffering’ and a ‘demonstrated risk of severe pain.’ ” Cooey (Biros) v. Strickland, 589 F.3d 210, 222 (6th Cir.2009) (quoting Baze v. Rees, 553 U.S. 35, 50, 128 *948 S.Ct. 1520, 170 L.Ed.2d 420 (2008)). An inmate could make a showing by developing a robust scientific record.[2] This is a new protocol, so it will necessarily take time to investigate how it may affect inmates in general. However, relying upon the likelihood of success requirement, we brashly rejected a request to do just this when we allowed Ohio to implement an untested protocol on Kenneth Biros just eight days after the State announced the change. Cooey (Biros) v. Strickland, 588 F.3d 921, reh’g en banc denied, 588 F.3d 924 (6th Cir.2009). We are now faced with the next question: will we allow inmates, like Beuke, with particularized conditions that may interact in unanticipated and unpredictable ways with the chemicals in the new protocol the time to develop their challenges and will we allow ourselves the time to consider them properly?
But, in the Sixth Circuit, there is no time — or at least no time like the present. We do not permit time for sufficient research to produce the record needed to make an informed decision. Instead, we encourage Ohio to continue its one-a-month execution march. If the science does not yet exist when an inmate’s appointed time comes, we say “alas, you have not shown a likelihood of suffering, maybe the next guy can.” And then we say the same thing the next month. The upshot is that an inmate staring down the barrel of the new protocol will only be able to show a likelihood of unnecessary suffering if someone ahead of him has suffered unnecessarily. Until the unthinkable happens, we charge ahead unthinking. As the district court noted, this is the functional equivalent of human experimentation. We tell Ohio to just keep going until an experiment goes horribly awry, as it did in the case of Romell Broom. Only then will we halt our rush to a result and remember that our true business is reasoned constitutional consideration.
In this case, it is clear that Beuke presents an individualized circumstance that, at the very least, creates a distinct possibility of needless suffering. If this is not the case in which we allow the inmate time to develop his claim, I would ask my fellow judges for an example of a case in which they would grant a stay. In light of the past several months, I cannot fathom what would suffice. I suspect that this request for an example will be met with deafening silence, as I am now convinced that, until we experience another failed execution, this Court will never interrupt Ohio’s monthly execution schedule to allow for meaningful inquiry. If this is the case, then we should just say so and save everyone the time and expense of death penalty appeals and the bother of continuing the kabuki dance of feigning constitutional deliberation.
*949 I would grant Beuke a stay, and I respectfully dissent from the majority’s contrary conclusion.

. We invented this requirement of showing a likelihood, meaning a greater than fifty percent chance, in Workman v. Breedesen, 486 F.3d 896, 904 (6th Cir.2007), by analogizing stay requests in death penalty cases to any other request for temporary injunctive relief. This despite the fact that the Supreme Court has stated that "inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits.” Hill v. McDonough, 547 U.S. 573, 584, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006) (emphasis added); see also Jones v. Hobbs, 604 F.3d 580, 582-83, 2010 WL 1767861, at *2-3 (8th Cir.2010) (Mellow, J., dissenting). “Likelihood of success” is a term of art used in many areas of the law, so if the Supreme Court had meant for that to be the standard, it would have said so. Instead, it set the requisite showing at a "significant possibility of success,” which is necessarily a lower burden. Beuke's case highlights Workman s folly, as it demonstrates the practical impossibility of an inmate being able to show a likelihood of suffering absent a past example of suffering.

. And by "robust scientific record,” I refer to scientific testimony or evidence that would satisfy the Supreme Court’s standard of a significant possibility of success on the merits, not our regional "likelihood” burden. To require a physician to quantify the likelihood of risk, the doctor would have to measure the risk in precise mathematical terms; indeed, this is exactly the basis on which the majority faults the testimony offered by Beuke at the district court. Though the physicians testified unequivocally that there was a significantly increased risk of a negative interaction in Beuke’s case, they could not precisely quantify the risk. I have never met a doctor who could give me a precisely calculated risk of anything, even with a substantial body of predictive scientific knowledge, so how can we require doctors to provide it when there has been such scant time to mine the data relevant to Ohio’s new protocol? For example, how can anyone quantify the "risk of nausea” in a given case? In applying the error of Workman and Biros to this case, as I concede that the majority must, they have imposed an impossible requirement.