Chief Judge KOZINSKI,
with whom Judges O’SCANNLAIN, McKEOWN, GOULD, TALLMAN, BYBEE, CALLAHAN and BEA join,
dissenting from the denial of rehearing en banc:
The Supreme Court has instructed us that an injunction is an “extraordinary and drastic remedy,” Munaf v. Geren, 553 U.S. 674, 689, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008), and we should be particularly hesitant to grant such relief where, as here, our stay of execution will trample on the *1141 state court’s judgment, see Baze v. Rees, 553 U.S. 35, 51 n. 2, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (plurality opinion) (instructing courts to give a “measure of deference to a State’s choice of execution procedures”); cf. also Ohio Civil Rights Comm’n v. Dayton Christian Sch., Inc., 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (“Because of our concerns for comity and federalism, we thought that it was ‘perfectly natural for our cases to repeat time and time again that the normal thing to do ... is not to issue such injunctions.’ ” (quoting Younger v. Harris, 401 U.S. 37, 45, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971))). Given these concerns, a court lacks discretion to issue an injunction unless the plaintiff shows that (1) “he is likely to succeed on the merits,” (2) “he is likely to suffer irreparable harm in the absence of preliminary relief,” (3) “the balance of equities tips in his favor,” and (4) “an injunction is in the public interest.” Winter v. Natural Res. Def. Council, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008).
Thus, “like any other stay applicants, inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits.” Hill v. McDonough, 547 U.S. 573, 584, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006). Moreover, a “preliminary injunction [for a stay of execution is] not granted unless the movant, by a clear showing, carries the burden of persuasion.” Id. (citing Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam)). Accordingly, to justify a preliminary injunction in this case, Landrigan would have to make a clear showing of a likelihood of success on his claim that Arizona’s three-drug protocol is “sure or very likely to cause ... needless suffering” in violation of the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); see also Cooper v. Rimmer, 379 F.3d 1029, 1033 (9th Cir.2004). This he has utterly failed to do.
Yet the panel affirms the district court’s preliminary injunction on the basis that the state never gave the panel the information about its lethal injection drugs that it provided to the district court. Landrigan v. Brewer, 625 F.3d 1144, 1148 (9th Cir.2010). But the state was required to provide no such information — to us or the district court — because Landrigan did not show even a possibility that he faces “a demonstrated risk of severe pain” during the scheduled execution. Baze, 553 U.S. at 61, 128 S.Ct. 1520. Under the standard adopted by the Supreme Court in Baze, the district court abused its discretion in imposing a stay.
The fulcrum of Landrigan’s Eighth Amendment claim is that the sodium thiopental that the state plans to use during his execution has been obtained from foreign sources that do not have FDA approval. Landrigan, 625 F.3d at 1145-46. Landrigan made two separate claims as to how this deficiency might harm him:
(1) The drug might be insufficiently potent, and thus fail to knock him unconscious, which would subject him to excruciating pain from the administration of the second and third drugs in the three-drug protocol.
(2) Administration of the sodium thiopental itself might cause Landrigan severe pain because it “could be contaminated with toxins.”
Landrigan v. Brewer, No. CV-10-02246 (ROS), 2010 WL 4269559, Order Granting Mot. for a TRO at 8-9 (D.Ariz. Oct. 25, 2010) (“District Court OrdeW).
As to claim (1), the state pointed out in the district court that, as part of the execution protocol, Arizona maintains strin *1142 gent safeguards to ensure that the prisoner is in fact unconscious at the time the second and third drugs are administered. These safeguards go far beyond those adopted in other states, such as California, and include the use of a microphone, a high resolution camera and physical inspection by medically trained personnel. Compare Baze, 553 U.S. at 120-21, 128 S.Ct. 1520 (Ginsburg, J., dissenting) (describing California’s procedures), with Dickens v. Brewer, No. CV07-1770 (NVW), 2009 WL 1904294, at *20 (D.Ariz. July 1, 2009) (discussing Arizona’s protocols and concluding that Arizona “provides more safeguards than does the [protocol at issue in Baze] against the risk that the sodium thiopental will be improperly administered”).
Significantly, the district court accepted the state’s argument and assumed in its order that Landrigan would be rendered unconscious by the non-FDA approved sodium thiopental. In footnote 5 of its order, it explained as follows:
Defendants have repeatedly misconstrued this issue. Defendants stress that Arizona’s protocol ensures that pancuronium bromide and potassium chloride will be administered only to an unconscious prisoner. While the protocol does offer safeguards in the event that inferior sodium thiopental fails to properly anesthetize Plaintiff] those safeguards do nothing to prevent the risk of harm from contaminants or a counterfeit product. A core portion of Plaintiffs claim — a portion Defendants choose to ignore — is that there may be a substantial risk of serious harm due to the administration of the sodium thiopental itself.
District Court Order at 10 n. 5 (emphasis added). The district court’s order thus hinges entirely on Landrigan’s claim that he might suffer severe pain from the administration of the sodium thiopental. But on that score, Landrigan has simply not carried his burden. While he makes a claim in his papers that this is possible, that claim is supported by three documents, none of which help his case.
The first document, the declaration of Dr. Palmer, says absolutely nothing about the risk of pain from the administration of the sodium thiopental itself. See District Court Order at 9. Dr. Palmer gives an example of a foreign drug that had been adulterated and caused harm to patients, but no example at all that caused instant, excruciating pain — or any pain at all. Also notably absent from Dr. Palmer’s declaration is any statement that the nature or composition of sodium thiopental is such that there is any substantial risk of harm and pain in connection with its use here. Dr. Palmer makes no reference to “the literature” containing any mention of contaminants or toxins. In short, there is no evidence of toxicity of the non-FDA approved sodium thiopental that could conceivably cause Landrigan pain on injection.
The second and third documents are statements by the FDA that foreign drugs may be counterfeit or of unknown quality, but neither document suggests that such drugs cause severe pain. Id. Nor is there any mention of sodium thiopental in particular. Landrigan’s and the district court’s speculation that the drug Arizona plans to use could cause pain is supported by nothing whatsoever. This lack of evidence in the record is particularly unforgivable given that Landrigan knew about the national shortage of sodium thiopental for over five months, but waited until the eleventh hour to assert his claim. See Nelson v. Campbell, 541 U.S. 637, 650, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004) (“Given the State’s significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a *1143 time as to allow consideration of the merits without requiring entry of a stay.” (internal citations omitted)).
I thus don’t see what necessity there was for the state to present any evidence to rebut Landrigan’s nonexistent showing. As to risk (1), the state showed that it has a protocol that ensures the prisoner is unconscious before the otherwise painful second and third drugs are administered. The district court did not find this protocol deficient, nor could it. As to risk (2), Landrigan has not shown any more than a speculative possibility that he will suffer pain during the execution.
Because Landrigan did not meet his burden, the state had no duty to come forward with any information. Indeed, Arizona had good reasons not to; just twenty-four hours after the state attorney general conceded that the drug was imported from Great Britain, one journalist suggested the company might be criminally liable under an EU regulation that makes it illegal to “trade in certain goods which could be used for capital punishment, torture, or other cruel, inhuman or degrading treatment.” See Clive S. Smith, The British Company Making a Business out of Killing, The Guardian (Oct. 26, 2010, 4:00 p.m.), http://www.guardian.co. uk/commentisfree/cifamerica/2010/oct/26/ jeffrey-landrigan-execution-sodiumthiopental. Certainly Arizona has a legitimate interest in avoiding a public attack on its private drug manufacturing sources, particularly when Hospira — the only source of sodium thiopental within the United States — hasn’t yet announced when the drug will actually be available for executions or how much it plans to produce. Although the district court may have been annoyed with the state for failing to provide the information Landrigan’s lawyers wanted to see, the fact remains that Landrigan was not entitled to the information because he failed to make a threshold showing that he will suffer harm.
It is not warranted for the district court or our three-judge panel to give primacy in Eighth Amendment analysis to a distinction between a drug manufactured by a domestic company, and approved by the FDA, and the same drug made by a manufacturer located in a foreign country. No evidence has been presented by Landrigan that the foreign manufacturer makes the drug in a way that would add toxins or would not satisfy its intended purpose.
Landrigan also seems to argue that he needs the information he requested in order to make out a claim in the first place. But there is no authority for the proposition that a prisoner is entitled to a stay in order to get discovery to make out a claim. See Hill, 547 U.S. at 584, 126 S.Ct. 2096 (observing that “a number of federal courts have invoked their equitable powers to dismiss suits they saw as speculative or filed too late in the day” when sustaining the suit would require a stay of execution). Rather, he must come forward with evidence that he may suffer serious harm before the state need provide any such information. Landrigan has offered nothing at all.
Federal courts are not “boards of inquiry charged with determining ‘best practices’ for executions.” Baze, 553 U.S. at 51, 128 S.Ct. 1520. Nor should the plaintiffs conclusory allegations kick off a mini-trial on drug certification and importation. We may only stop an execution if plaintiff has met the standard for injunctive relief, including making out a strong case of likelihood of success on the merits. The panel in this case made an egregious error by affirming the district court’s stay of Landrigan’s execution with no showing of an Eighth Amendment violation. This error is serious, and, if left uncorrected, likely to *1144 be repeated by future panels who do not respect “the State’s legitimate interest in carrying out a sentence of death in a timely manner.” Id. at 61, 128 S.Ct. 1520.
The Supreme Court told us in Baze that “to prevail on [an Eighth Amendment] claim there must be a ‘substantial risk of serious harm,’ an ‘objectively intolerable risk of harm.’ ” Id. at 50, 128 S.Ct. 1520. But Landrigan’s sheer speculation that he might suffer from a contaminated or unapproved dose of sodium thiopental obtained from outside the United States comes nowhere near meeting his burden to “establish that such exposure ... presents] the risk [which] must be ‘sure or very likely to cause serious illness and needless suffering,’ and give rise to ‘sufficiently imminent dangers.’ ” Id. at 49-50, 128 S.Ct. 1520. Instead, by countenancing such untimely hypothetical arguments, we are simply encouraging collateral litigation that is embroiling us in scientific controversies beyond our expertise, and intruding on legislative and executive prerogative in providing for humane manners of execution. See id. at 51, 128 S.Ct. 1520. In the process we are promoting new obstacles to prevent states from carrying out legitimate judgments and losing sight of our overarching responsibility to see that justice is done. Because I believe the panel disregards both the state’s legitimate interests and Supreme Court precedent, I must dissent from our failure to grant rehearing en banc.