*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RICHARD COOEY,

                                   *Plaintiff,*

                                                              No. 10-3598

MICHAEL BEUKE,

         *Plaintiff-Intervenor-Appellant,*

         *v.*

TED STRICKLAND, Governor, State of Ohio;
ERNIE L. MOORE, Director, Ohio Department
of Rehabilitation and Correction; DONALD
MORGAN, Warden, Southern Ohio
Correctional Facility,

                   *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-01156—Gregory L. Frost, District Judge.

Submitted: May 11, 2010

Decided and Filed: May 12, 2010

Before: BATCHELDER, Chief Judge; MARTIN and NORRIS, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Charles L. Wille, Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY
GENERAL, Columbus, Ohio, for Appellees.

     BATCHELDER, C.J., delivered the opinion of the court, in which NORRIS, J.,
joined. MARTIN, J. (pp. 12-14), delivered a separate dissenting opinion.

1

———————————

**OPINION**

———————————

ALICE M. BATCHELDER, Chief Judge.  Intervenor-Plaintiff Michael Beuke, an Ohio death row inmate, appeals from the order of the United States District Court for the Southern District of Ohio, Eastern Division, denying both his motion for injunctive relief filed pursuant to 42 U.S.C. § 1983, and his oral request to stay his execution pending appeal of the decision.  On appeal, Beuke also requests, in the alternative, that a single judge issue a stay enjoining his execution while he appeals the district court's decision, pursuant to Federal Rule of Appellate Procedure 8(a)(2)(A)(ii) and 8(2)(D).  For the reasons that follow, we affirm the opinion of the district court denying Beuke's motion for injunctive relief, and further deny his request for a stay enjoining his execution.

**I.**

Beuke is scheduled to be executed on May 13, 2010.  The district court permitted him to intervene for a second time in the present lawsuit on March 23, 2010, and on May 6, 2010, he filed a motion for injunctive relief to enjoin the State of Ohio from utilizing its alternative execution plan ("Plan B") under its current lethal injection protocol.  The district court held a hearing on May 10, 2010, during which it heard testimony from Beuke's two experts, Dr. Edward D. French and Dr. Mark J.S. Heath.  Defendants called no witnesses but requested that the district court incorporate previous testimony of Dr. Mark Dershwitz, who has testified on numerous prior occasions on behalf of defendants in this lawsuit.  On May 11, 2010, the district court denied Beuke's motion for injunctive relief and his motion for a stay pending appeal.

Michael Beuke was convicted in October 1983 of one count of aggravated murder, two counts of attempted aggravated murder, three counts of aggravated robbery, three counts of kidnapping, and one count of carrying a concealed weapon.  The aggravated murder charge also included two specifications, either of which alone – if proven beyond a reasonable doubt – would make him eligible for the death penalty:  (1) committing aggravated murder as part of a course of conduct involving the purposeful attempt to kill two or more persons, and (2) committing aggravated murder in the course of an aggravated

robbery.  The jury found that both specifications were proven beyond a reasonable doubt. At the penalty hearing, the jury also found beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors and recommended the death penalty.  The trial court adopted the recommendation and imposed the death penalty.

Having completed and failed in his direct appeal, two petitions for post-conviction relief, and two habeas attempts, in November 2007, Beuke moved the District Court for the Southern District of Ohio to allow him to intervene in a lawsuit challenging the constitutionality of Ohio's then applicable lethal injection protocol, *Cooey v. Strickland, et. al.*, No. 04-01156 (S.D. Ohio).  The district court granted the motion to intervene on February 15, 2008, and Beuke filed his intervenor complaint the same day.  However, the district court dismissed his action on August 25, 2008, on the ground that the decision in *Cooey v. Strickland*, 479 F.3d 412 (6th Cir. 2007), required dismissal, on statute of limitations grounds, of Beuke's 42 U.S.C. § 1983 claims.  Beuke did not appeal.

The remaining plaintiffs in the *Cooey* action continued to litigate their challenge to the lethal injection process, and in the meantime, Ohio changed its execution protocol, making changes which were designed to make the State's capital punishment protocol more humane.  The new protocol, which took effect on November 30, 2009, utilizes a one-drug, IV injection ("Plan A") with a two-drug, intramuscular injection back-up procedure if the execution team fails to locate veins suitable for IV transmittal ("Plan B").  *See Cooey (Biros) v. Strickland*, 589 F.3d 210, 217 (6th Cir. 2009).  Given the change of policy, the statute of limitations to challenge the new procedure began to run anew.

But it was not until March 17, 2010, that Beuke filed a motion to intervene once again in the pending lawsuit in the district court, despite knowing that his execution date of May 13, 2010 (scheduled by the State of Ohio on November 4, 2009), was drawing near. The district court granted the motion to intervene on March 23, 2010, and Beuke filed his new intervenor complaint the same day.  Defendants filed a motion to dismiss the complaint on April 6, 2010.  A month later, on May 3, 2010, Beuke filed a motion for leave to untimely file a response in opposition to the motion to dismiss.  The district court granted the motion. On May 7, 2010, Beuke filed a motion to amend his complaint to include claims challenging the State's use of Plan B as a back-up execution plan, arguing that his anti-seizure

medication would interact with and reduce the effects of the drugs utilized in Plan B. He also sought to enjoin the defendants from using Plan B to carry out his execution.

The district court held a hearing on Beuke's amended complaint on May 10, 2010, at 2:00 p.m., and at the conclusion of that hearing, counsel for Beuke orally requested a stay of his execution pending appeal should his motion for injunctive relief be denied. On May 11, 2010, the district court denied the motion for injunctive relief, as well as his request for a stay pending appeal. Beuke filed a timely notice of appeal the same day.

We extensively described Ohio's new execution protocol in the *Biros* case. But in a nutshell, Plan A, which Beuke does not challenge, involves intravenous injection of five grams of thiopental sodium. The back-up plan, Plan B, which Beuke is challenging, is used only if a prisoner's veins prove too difficult to access. Plan B involves a two-drug injection of 10 milligrams of midazolam and 40 milligrams of hydromorphone, which are administered in a single syringe intramuscularly. A medical team member, after administering the injection and waiting five minutes, will examine the inmate for signs of breathing. Then, if necessary, a second injection of the same mixture will be administered, and the inmate will be re-examined after five more minutes for signs of breathing. Then only if there are continued signs of breathing will a final injection of 60 milligrams of hydromorphone be administered. *See Cooey (Biros)*, 589 F.3d at 220.

Beuke's challenge to the use of Plan B is premised on the allegation that its use will be unconstitutional as applied to him because he takes anti-seizure medication daily that will interact with the midazolam in such a way as to produce various undesirable effects. Because of a seizure disorder, Beuke takes 120 milligrams per day of the drug phenobarbital, and has been taking the drug daily for approximately five years. (R. 751-4, Amend. Compl. at ¶¶ 5, 7). Phenobarbital is a barbiturate that acts as an anticonvulsant to depress one's central nervous system. (*Id.* at ¶ 5). Likewise, midazolam produces depressant effects such as sedation, anti-anxiety, and unconsciousness. (*Id.* at ¶ 6). Because of his chronic intake of phenobarbital, there is a high likelihood, Beuke claims, that he will have an increased tolerance to the amount of midazolam given during Plan B, and because of this increased tolerance, the rate at which he descends into unconsciousness would be slowed, resulting in an increased chance of his experiencing the effects of hydromorphone. (*Id.* at ¶ 8). Thus,

he may consciously experience the side effects of hydromorphone, which can include, *inter alia*, nausea, vomiting, disinhibited speech, delirium, anxiety, or disorientation. (*Id.*).  The increased risk of this type of experience if he is subjected to Plan B, Beuke argues, violates both his right to be free from cruel and unusual punishments under the Eighth Amendment, and a claimed "liberty, life, and property" interest arising under Ohio Rev. Code § 2949.22(A) that is ultimately protected under the due process clause of the Fourteenth Amendment, that entitles him to a "quick and painless death." (*Id.* at ¶¶ 11, 13, 16).[1]

## II.

In his appeal from the district court's decision denying injunctive relief, Beuke requests that we enjoin the State from utilizing Plan B to carry out his execution because seizure medications that he is taking, namely phenytoin and phenobarbital, may interact with the Plan B drugs so as to violate his constitutional rights under the Eighth and Fourteenth Amendments.  In reviewing the denial of the motion for injunctive relief, we consider four factors:  "(1) whether [Beuke] has demonstrated a strong likelihood of success on the merits; (2) whether he will suffer irreparable injury in the absence of equitable relief; (3) whether the stay will cause substantial harm to others; and (4) whether the public interest is best served by granting the stay." *Cooey (Biros)*, 589 F.3d at 218 (citing *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007)).  "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Id.* (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).  We review the district court's factual findings for clear error and its legal conclusions de novo.  *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 618-19 (6th Cir. 2009).

Beuke first challenges Ohio's use of Plan B as violative of his Eighth Amendment right to be free from cruel and unusual punishment.  To demonstrate a likelihood of success on the merits of this claim, Beuke is required to demonstrate that

---

[1]Beuke also asserted a claim in his amended complaint that because of the drug interaction, he will not be competent to be executed when his execution is imminent, in violation of standards set out in *Ford v. Wainwright*, 477 U.S. 399 (1986).  He did not focus on such a claim in the district court hearing, and he does not raise it on appeal.  It is deemed waived.

in utilizing Plan B, the State of Ohio's "protocol ignores a 'sure or very likely' risk of serious pain 'and needless suffering' which 'creates a demonstrated risk of severe pain' that is 'substantial when compared to the known and available alternatives.'" *Cooey (Biros)*, 589 F.3d at 220 (quoting *Baze v. Rees*, 553 U.S. 35, 50, 61 (2008)).

After carefully reviewing the written submissions and the oral testimony of both Dr. French and Dr. Heath, we conclude that this evidence is wholly insufficient to demonstrate that Plan B creates a "demonstrated risk of severe pain." In testifying as to the predicted effects of Plan B's dosage of midazolam on Beuke, Dr. Heath opined that there was a "very high likelihood" that "Beauke will have a reduced effect to the midazolam, or he will be resistant to the midazolam." (Tr. at 54). However, when asked to quantify these effects, Dr. Heath noted that "I can't put an exact number on it. All I can say is that, as a practitioner who sees this frequently, it would be my strong expectation that I would have to give him a lot more midazolam to achieve the same effect. How much more, I don't know." (*Id.*). And even while noting his belief that the effects of the midazolam would be reduced due to "cross tolerance" as a result of his seizure medications, Dr. Heath testified that the result would be merely to "prolong the dissent [sic] from consciousness into unconsciousness" (Tr. at 81) so that Beuke would experience more of the intoxicating effects of the hydromorphone, which may include "nausea and vomiting, hallucinations or delusions, [and] basically confused thinking." (Tr. at 66). But Dr. Heath expressly stated that the actual "cross tolerance" itself, or "intoxication," did not equate to pain. (Tr. at 80, 81). Neither Dr. Heath nor Dr. French could quantify the likelihood of nausea or vomiting in connection with the use of hydromorphone. (Tr. at 82). Nor could Dr. French give any definitive answer regarding how tolerant Beuke would be to midazolam. When asked whether Beuke, because of his use of anti-seizure medications, would fall outside the category of individuals who would have a typical reaction to midazolam, Dr. French said, "It is my opinion that he could, and I think it's not improbable." (Tr. at 27). Finally, Dr. French could not predict that there would be an increased probability of nausea and vomiting side effects as dosage levels of hydromorphone were increased. (Tr. at 41).

As the district court noted in its order, this testimony necessitates the conclusion that "any estimation of what side effects are likely to occur and the severity of those side effects is wholly speculative." (Dist. Ct. Order at 7). This sort of speculation cannot meet the standard of a "sure or very likely risk of serious pain . . . that is substantial when compared to the known and available alternatives." *Cooey (Biros)*, 589 F.3d at 220. In any event, the only available alternative that Beuke submits is Plan A, which is the default method for execution. Similarly to the defendant in *Biros*, Beuke does not argue that he has difficult-to-access veins, and Plan B "comes into play only when an IV injection [under Plan A] is not possible. . . .That reality alone diminishes the alleged risks." *Id.* at 229. And Plan B's entire purpose is to minimize any difficulties encountered during the use of Plan A. *See id.* at 222 ("the purpose of the intramuscular injection seeks to avoid an unduly prolonged search for difficult-to-access veins and to provide a safe, non-IV lethal injection method"). There has been no showing that this substitute method is more likely to result in severe pain than continuing with increasingly lengthy attempts at IV injection under Plan A.

But Beuke maintains that the district court erred by focusing solely on the likelihood that he would suffer severe pain if subjected to the protocol of Plan B. Beuke argues that the district court failed to consider whether he had demonstrated that the use of Plan B creates an "objectively intolerable risk of harm" that is "substantial when compared to the known and available alternatives." *Id*. at 215. Beuke fares no better with this argument.

The district court did not specifically explain which of the two phrases — "risk of severe pain" or "objectively intolerable risk of harm" — it was focusing upon in its analysis, but it is true that it appears to focus more particularly on the risk of severe pain. And this is understandable, given that at the hearing, much of the testimony was directed at the potential for Beuke to experience possible side effects from the hydromorphone, such as nausea and vomiting. Nevertheless, we will also review the evidence specifically to determine whether it compels a finding that Plan B presents an "objectively intolerable risk of harm."

A threshold question, then, is what is the "harm" that is being referenced? It surely cannot be an inmate's ultimate death, as that is the intended consequence of any execution protocol. Beuke argues that the risk of harm that is objectively intolerable is the likelihood that his response to midazolam would result in a lessened sedative effect, i.e., a sedative effect less than he would experience from the same dosage of midazolam if he had not been taking his anti-seizure medication, with the concomitant result that he would experience the effects of the hydromorphone more acutely. (*See* Beuke's Br. at 12). However, neither of Beuke's experts – not Dr. French, nor Dr. Heath – could quantify the extent of any tolerance of the midazolam Beuke may have. All that was demonstrated was that it was likely that Beuke would have some elevated level of tolerance. Of course, as we have already pointed out, the experts testified that the increased tolerance level would not itself cause any discomfort. This lack of quantification of even the extent of Beuke's potential tolerance to the Plan B drugs, not to mention the lack of quantification of the likelihood of Beuke's experiencing any uncomfortable side effects from the hydromorphone, renders unsustainable his argument that he has demonstrated an "objectively intolerable risk of harm." Mere likelihood of an increased tolerance to the Plan B sedative, which may possibly lead in turn to Beuke's experiencing uncertain but potentially uncomfortable side effects from the hydromorphone is not a risk of harm which is either objective or intolerable.

Beuke also challenges the Plan B protocol as violative of his right to a "quick and painless death" that arises under Section 2949.22(A) of the Ohio Revised Code. He argues that even though this interest arises under state law, it is nonetheless protected as a right under the due process clause of the Fourteenth Amendment. The district court did not directly address this argument; however, it is foreclosed by our decision in *Biros.* There, we specifically noted that Section 2949.22 "creates no cause of action to enforce any right to a quick and painless death." *Cooey (Biros)*, 589 F.3d at 234 (citing *State v. Rivera*, 2009 WL 806819, at *7 (Ohio Ct. App. Mar. 30, 2009)). And we noted that we were unpersuaded by assertions that § 2949.22 creates a federal right protected by the Fourteenth Amendment. *Id.* We remain unpersuaded.

We agree with the district court that Beuke has failed to demonstrate any likelihood of success on the merits of his claim that use of the Plan B procedure would violate his Eighth Amendment rights.  And we conclude that he has also failed to demonstrate any likelihood of success on the merits of his claim that the procedure would violate any right protected by the Fourteenth Amendment.  Because Beuke cannot make any showing that he has any likelihood of success, we find the first factor dispositive.  *See Workman v. Bredesen*, 486 F.3d 896, 911 (6th Cir. 2007).  Nonetheless, we note that Beuke has not established any of the other factors.  He cannot show that he would be irreparably harmed by failure to stay the execution because he has provided no evidence that he will ever be subjected to Plan B, the only part of the Ohio execution protocol to which he objects.  And both the third and the fourth factors weigh against granting the stay.  The state has a "significant interest in meting out a sentence of death in a timely fashion," *Nelson v. Campbell*, 541 U.S. 637, 644 (2004), and, as the Supreme Court has repeatedly held, a compelling interest in ensuring the finality of its judgments.  *See McCleskey v. Zant*, 499 U.S.  467, 491 (1991) ("Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power to a State to pass laws means little if the State cannot enforce them.")  "To unsettle these expectations is to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (quoting *Herrera v. Collins*, 506 U.S. 390, 421 (1993)).  Importantly, these cases make this point in the context of habeas corpus review; how much more must this principle be respected when a last-minute stay of execution is sought in the context of a § 1983 action.

### III.

"While the absence of any meaningful chance of success on the merits suffices to resolve this matter," *Workman*, 486 F.3d at 911, a final point should be made about the nature of Beuke's request for a stay of execution:  "a stay is an equitable remedy, and equity must take into consideration the State's strong interest in proceeding with its judgment." *Nelson*, 541 U.S. at 649.  Even if Beuke had stated a cognizable § 1983

claim, "the mere fact that an inmate states a cognizable § 1983 claim does not warrant the entry of a stay as a matter of right." *Id.*  In fact, "in considering the equitable remedy of staying an execution, 'a district court *must* consider . . . the extent to which the inmate has delayed unnecessarily in bringing the claim.'" *Workman*, 486 F.3d at 911 (quoting *Nelson*, 541 U.S. at 649-50).  "There is 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Id.* (quoting *Nelson*, 541 U.S. at 650).

While Beuke's delay may not be as egregious as that of the defendant in *Workman*, it nonetheless "could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay."  Beuke has been taking anti-seizure medication for several years.  Ohio's revised method of execution that includes Plan B as a back-up was instituted in November 2009.  Beuke's current execution date of May 13, 2010, was also set in November 2009.  Nevertheless, he waited until March 17, 2010, to move the district court to intervene and, waited until only one week prior to his execution date to amend his complaint to bring the particularized challenges to Plan B that he is currently asserting on appeal.  This constitutes unnecessary delay, and Beuke has failed to overcome the "strong equitable presumption" against the grant of his stay request.

Finally, "[i]n the alternative, Beuke respectfully requests that a single judge on this Court expeditiously issue a stay enjoining his execution [pending] his appeal of the District Court's decision to denying [sic] him relief[,] pursuant to Federal Rule of Appellate Procedure 8(a)(2)(A)(ii) and 8(2)(D)."  This alternative relief is wholly unavailable here.  The purpose of a single-judge stay is to provide potential relief when the panel to which the appeal is assigned is not available to consider the merits of the claim.  In a case such as this, where the panel is not only available to consider but in fact has considered the merits of the case, Rule 8(a)(2)(D) is simply inapplicable.

**IV.**

For the foregoing reasons, we **AFFIRM** the judgment of the district court, and we **DENY** the motion for injunctive relief.

––––––––––––––––

## DISSENT

––––––––––––––––

BOYCE F. MARTIN, JR., Circuit Judge, dissenting. Michael Beuke seeks a stay of his execution on the basis that an anti-seizure medication that he has been taking for some time would interact negatively and painfully with one of the drugs in the Plan B intramuscular injection, should his executioners encounter difficulty administering the State of Ohio's new one-drug injection protocol. At a hearing before the district court, Beuke presented evidence that there was a concrete possibility that such a reaction could occur, but the district court found that he had failed to prove that it was "likely" to occur. I would reverse and grant the stay.

*       *       *       *       *

This is another in the long line of cases that have developed in the short period since the State of Ohio drastically altered its lethal injection protocol in November 2009. Though, as far as I know, Ohio has not yet encountered problems in carrying out executions under its latest protocol, the fact remains that Ohio is blazing a very new trail. Only time will tell if the changed protocol actually addressed the problems alleged to have surrounded the prior three-drug method of execution.

But that's the point. Only time will tell. Under *Cooey* and its progeny, inmates facing execution must show a likelihood[1] that use of this protocol will result in "'needless suffering' and a 'demonstrated risk of severe pain.'" *Cooey (Biros) v. Strickland*, 589 F.3d 210, 222 (6th Cir. 2009) (quoting *Baze v. Rees*, 553 U.S. 35, 50

––––––––––––––––

[1]We invented this requirement of showing a likelihood, meaning a greater than fifty percent chance, in *Workman v. Bredsen*, 486 F.3d 896, 904 (6th Cir. 2007), by analogizing stay requests in death penalty cases to any other request for temporary injunctive relief. This despite the fact that the Supreme Court has stated that "inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including *a showing of a significant possibility of success* on the merits." *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (emphasis added); *see also Jones v. Hobbes*, 2010 WL 1767861, at *2-3 (8th Cir. Apr. 9, 2010) (Mellow, J., dissenting). "Likelihood of success" is a term of art used in many areas of the law, so if the Supreme Court had meant for that to be the standard, it would have said so. Instead, it set the requisite showing at a "significant possibility of success," which is necessarily a lower burden. Beuke's case highlights *Workman*'s folly, as it demonstrates the practical impossibility of an inmate being able to show a likelihood of suffering absent a past example of suffering.

(2008)).  An inmate could make a showing by developing a robust scientific record.**²**

This is a new protocol, so it will necessarily take time to investigate how it may affect

inmates in general.  However, relying upon the likelihood of success requirement, we

brashly rejected a request to do just this when we allowed Ohio to implement an untested

protocol on Kenneth Biros just eight days after the State announced the change.  *Cooey*

*(Biros) v. Strickland*, 588 F.3d 921, *reh'g en banc denied*, 588 F.3d 924 (6th Cir. 2009).

We are now faced with the next question:  will we allow inmates, like Beuke, with

particularized conditions that may interact in unanticipated and unpredictable ways with

the chemicals in the new protocol the time to develop their challenges and will we allow

ourselves the time to consider them properly?

But, in the Sixth Circuit, there is no time—or at least no time like the present.

We do not permit time for sufficient research to produce the record needed to make an

informed decision.  Instead, we encourage Ohio to continue its one-a-month execution

march.  If the science does not yet exist when an inmate's appointed time comes, we say

"alas, you have not shown a likelihood of suffering, maybe the next guy can."  And then

we say the same thing the next month.  The upshot is that an inmate staring down the

barrel of the new protocol will only be able to show a likelihood of unnecessary

suffering if someone ahead of him has suffered unnecessarily.  Until the unthinkable

happens, we charge ahead unthinking.  As the district court noted, this is the functional

equivalent of human experimentation.  We tell Ohio to just keep going until an

experiment goes horribly awry, as it did in the case of Romell Broom.  Only then will

we halt our rush to a result and remember that our true business is reasoned

constitutional consideration.

---

**²**And by "robust scientific record," I refer to scientific testimony or evidence that would satisfy
the Supreme Court's standard of a significant possibility of success on the merits, not our regional
"likelihood" burden.  To require a physician to quantify the likelihood of risk, the doctor would have to
measure the risk in precise mathematical terms; indeed, this is exactly the basis on which the majority
faults the testimony offered by Beuke at the district court.  Though the physicians testified unequivocally
that there was a significantly increased risk of a negative interaction in Beuke's case, they could not
precisely quantify the risk.  I have never met a doctor who could give me a precisely calculated risk of
anything, even with a substantial body of predictive scientific knowledge, so how can we require doctors
to provide it when there has been such scant time to mine the data relevant to Ohio's new protocol?  For
example, how can anyone quantify the "risk of nausea" in a given case?  In applying the error of *Workman*
and *Biros* to this case, as I concede that the majority must, they have imposed an impossible requirement.

In this case, it is clear that Beuke presents an individualized circumstance that, at the very least, creates a distinct possibility of needless suffering. If *this* is not the case in which we allow the inmate time to develop his claim, I would ask my fellow judges for an example of a case in which they *would* grant a stay. In light of the past several months, I cannot fathom what would suffice. I suspect that this request for an example will be met with deafening silence, as I am now convinced that, until we experience another failed execution, this Court will never interrupt Ohio's monthly execution schedule to allow for meaningful inquiry. If this is the case, then we should just say so and save everyone the time and expense of death penalty appeals and the bother of continuing the kabuki dance of feigning constitutional deliberation.

I would grant Beuke a stay, and I respectfully dissent from the majority's contrary conclusion.