BATCHELDER, C.J., delivered the opinion of the court, in which NORRIS, J., joined. MARTIN, J. (pp. 947-49), delivered a separate dissenting opinion.
OPINION
ALICE M. BATCHELDER, Chief Judge.
Intervenor-Plaintiff Michael Beuke, an Ohio death row inmate, appeals from the order of the United States District Court for the Southern District of Ohio, Eastern Division, denying both his motion for injunctive relief filed pursuant to 42 U.S.C. § 1983, and his oral request to stay his execution pending appeal of the decision. On appeal, Beuke also requests, in the alternative, that a single judge issue a stay enjoining his execution while he appeals the district court’s decision, pursuant to Federal Rule of Appellate Procedure 8(a)(2)(A)(ii) and (a)(2)(D). For the reasons that follow, we affirm the opinion of the district court denying Beuke’s motion for injunctive relief, and further deny his request for a stay enjoining his execution.
I.
Beuke is scheduled to be executed on May 13, 2010. The district court permitted him to intervene for a second time in the present lawsuit on March 23, 2010, and on May 6, 2010, he filed a motion for injunctive relief to enjoin the State of Ohio from utilizing its alternative execution plan (“Plan B”) under its current lethal injection protocol. The district court held a hearing on May 10, 2010, during which it heard testimony from Beuke’s two experts, Dr. Edward D. French and Dr. Mark J.S. Heath. Defendants called no witnesses but requested that the district court incorporate previous testimony of Dr. Mark Dershwitz, who has testified on numerous prior occasions on behalf of defendants in this lawsuit. On May 11, 2010, the district court denied Beuke’s motion for injunctive relief and his motion for a stay pending appeal.
Michael Beuke was convicted in October 1983 of one count of aggravated murder, two counts of attempted aggravated murder, three counts of aggravated robbery, three counts of kidnapping, and one count of carrying a concealed weapon. The aggravated murder charge also included two specifications, either of which alone — if proven beyond a reasonable doubt — would make him eligible for the death penalty: (1) committing aggravated murder as part of a course of conduct involving the purposeful attempt to kill two or more persons, and (2) committing aggravated murder in the course of an aggravated robbery. The jury found that both specifications were proven beyond a reasonable doubt. At the penalty hearing, the jury also found beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors and rec *942 ommended the death penalty. The trial court adopted the recommendation and imposed the death penalty.
Having completed and failed in his direct appeal, two petitions for post-conviction relief, and two habeas attempts, in November 2007, Beuke moved the District Court for the Southern District of Ohio to allow him to intervene in a lawsuit challenging the constitutionality of Ohio’s then applicable lethal injection protocol, Cooey v. Strickland., No. 04-CV-01156, 2010 WL 1882263 (S.D.Ohio May 11, 2010). The district court granted the motion to intervene on February 15, 2008, and Beuke filed his intervenor complaint the same day. However, the district court dismissed his action on August 25, 2008, on the ground that the decision in Cooey v. Strickland, 479 F.3d 412 (6th Cir.2007), required dismissal, on statute of limitations grounds, of Beuke’s 42 U.S.C. § 1983 claims. Beuke did not appeal.
The remaining plaintiffs in the Cooey action continued to litigate their challenge to the lethal injection process, and in the meantime, Ohio changed its execution protocol, making changes which were designed to make the State’s capital punishment protocol more humane. The new protocol, which took effect on November 30, 2009, utilizes a one-drug, IV injection (“Plan A”) with a two-drug, intramuscular injection back-up procedure if the execution team fails to locate veins suitable for IV transmittal (“Plan B”). See Cooey (Biros) v. Strickland, 589 F.3d 210, 217 (6th Cir.2009). Given the change of policy, the statute of limitations to challenge the new procedure began to run anew.
But it was not until March 17, 2010, that Beuke filed a motion to intervene once again in the pending lawsuit in the district court, despite knowing that his execution date of May 13, 2010 (scheduled by the State of Ohio on November 4, 2009), was drawing near. The district court granted the motion to intervene on March 23, 2010, and Beuke filed his new intervenor complaint the same day. Defendants filed a motion to dismiss the complaint on April 6, 2010. A month later, on May 3, 2010, Beuke filed a motion for leave to untimely file a response in opposition to the motion to dismiss. The district court granted the motion. On May 7, 2010, Beuke filed a motion to amend his complaint to include claims challenging the State’s use of Plan B as a back-up execution plan, arguing that his anti-seizure medication would interact with and reduce the effects of the drugs utilized in Plan B. He also sought to enjoin the defendants from using Plan B to carry out his execution.
The district court held a hearing on Beuke’s amended complaint on May 10, 2010, at 2:00 p.m., and at the conclusion of that hearing, counsel for Beuke orally requested a stay of his execution pending appeal should his motion for injunctive relief be denied. On May 11, 2010, the district court denied the motion for injunctive relief, as well as his request for a stay pending appeal. Beuke filed a timely notice of appeal the same day.
We extensively described Ohio’s new execution protocol in the Biros case. But in a nutshell, Plan A, which Beuke does not challenge, involves intravenous injection of five grams of thiopental sodium. The back-up plan, Plan B, which Beuke is challenging, is used only if a prisoner’s veins prove too difficult to access. Plan B involves a two-drug injection of 10 milligrams of midazolam and 40 milligrams of hydromorphone, which are administered in a single syringe intramuscularly. A medical team member, after administering the injection and waiting five minutes, will examine the inmate for signs of breathing. Then, if necessary, a second injection of the same mixture will be administered, and the inmate will be re-examined after five *943 more minutes for signs of breathing. Then only if there are continued signs of breathing will a final injection of 60 milligrams of hydromorphone be administered. See Cooey (Biros), 589 F.3d at 220.
Beuke’s challenge to the use of Plan B is premised on the allegation that its use will be unconstitutional as applied to him because he takes anti-seizure medication daily that will interact with the midazolam in such a way as to produce various undesirable effects. Because of a seizure disorder, Beuke takes 120 milligrams per day of the drug phenobarbital, and has been taking the drug daily for approximately five years. (R. 751-4, Amend. Compl. at ¶¶ 5, 7). Phenobarbital is a barbiturate that acts as an anticonvulsant to depress one’s central nervous system. (Id. at ¶ 5). Likewise, midazolam produces depressant effects such as sedation, anti-anxiety, and unconsciousness. (Id. at ¶ 6). Because of his chronic intake of phenobarbital, there is a high likelihood, Beuke claims, that he will have an increased tolerance to the amount of midazolam given during Plan B, and because of this increased tolerance, the rate at which he descends into unconsciousness would be slowed, resulting in an increased chance of his experiencing the effects of hydromorphone. (Id. at ¶ 8). Thus, he may consciously experience the side effects of hydromorphone, which can include, inter alia, nausea, vomiting, disinhibited speech, delirium, anxiety, or disorientation. (Id.). The increased risk of this type of experience if he is subjected to Plan B, Beuke argues, violates both his right to be free from cruel and unusual punishments under the Eighth Amendment, and a claimed “liberty, life, and property” interest arising under Ohio Rev.Code § 2949.22(A) that is ultimately protected under the due process clause of the Fourteenth Amendment, that entitles him to a “quick and painless death.” (Id. at ¶¶ 11, 13, 16).[1]
II.
In his appeal from the district court’s decision denying injunctive relief, Beuke requests that we enjoin the State from utilizing Plan B to carry out his execution because seizure medications that he is taking, namely phenytoin and phenobarbital, may interact with the Plan B drugs so as to violate his constitutional rights under the Eighth and Fourteenth Amendments. In reviewing the denial of the motion for injunctive relief, we consider four factors: “(1) whether [Beuke] has demonstrated a strong likelihood of success on the merits; (2) whether he will suffer irreparable injury in the absence of equitable relief; (3) whether the stay will cause substantial harm to others; and (4) whether the public interest is best served by granting the stay.” Cooey (Biros), 589 F.3d at 218 (citing Workman v. Bredesen, 486 F.3d 896, 905 (6th Cir.2007)). “These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together.” Id. (quoting Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 153 (6th Cir.1991)). We review the district court’s factual findings for clear error and its legal conclusions de novo. H.D. V.-Greektown, LLC v. City of Detroit, 568 F.3d 609, 618-19 (6th Cir.2009).
*944 Beuke first challenges Ohio’s use of Plan B as violative of his Eighth Amendment right to be free from cruel and unusual punishment. To demonstrate a likelihood of success on the merits of this claim, Beuke is required to demonstrate that in utilizing Plan B, the State of Ohio’s “protocol ignores a ‘sure or very likely’ risk of serious pain ‘and needless suffering’ which ‘creates a demonstrated risk of severe pain’ that is ‘substantial when compared to the known and available alternatives.’ ” Cooey (Biros), 589 F.3d at 220 (quoting Baze v. Rees, 553 U.S. 35, 50, 61, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008)).
After carefully reviewing the written submissions and the oral testimony of both Dr. French and Dr. Heath, we conclude that this evidence is wholly insufficient to demonstrate that Plan B creates a “demonstrated risk of severe pain.” In testifying as to the predicted effects of Plan B’s dosage of midazolam on Beuke, Dr. Heath opined that there was a “very high likelihood” that “Beauke will have a reduced effect to the midazolam, or he will be resistant to the midazolam.” (Tr. at 54). However, when asked to quantify these effects, Dr. Heath noted that “I can’t put an exact number on it. All I can say is that, as a practitioner who sees this frequently, it would be my strong expectation that I would have to give him a lot more midazolam to achieve the same effect. How much more, I don’t know.” (Id.). And even while noting his belief that the effects of the midazolam would be reduced due to “cross tolerance” as a result of his seizure medications, Dr. Heath testified that the result would be merely to “prolong the dissent [sic] from consciousness into unconsciousness” (Tr. at 81) so that Beuke would experience more of the intoxicating effects of the hydromorphone, which may include “nausea and vomiting, hallucinations or delusions, [and] basically confused thinking.” (Tr. at 66). But Dr. Heath expressly stated that the actual “cross tolerance” itself, or “intoxication,” did not equate to pain. (Tr. at 80, 81). Neither Dr. Heath nor Dr. French could quantify the likelihood of nausea or vomiting in connection with the use of hydromorphone. (Tr. at 82). Nor could Dr. French give any definitive answer regarding how tolerant Beuke would be to midazolam. When asked whether Beuke, because of his use of anti-seizure medications, would fall outside the category of individuals who would have a typical reaction to midazolam, Dr. French said, “It is my opinion that he could, and I think it’s not improbable.” (Tr. at 27). Finally, Dr. French could not predict that there would be an increased probability of nausea and vomiting side effects as dosage levels of hydromorphone were increased. (Tr. at 41).
As the district court noted in its order, this testimony necessitates the conclusion that “any estimation of what side effects are likely to occur and the severity of those side effects is wholly speculative.” (Dist. Ct. Order at 7). This sort of speculation cannot meet the standard of a “sure or very likely risk of serious pain ... that is substantial when compared to the known and available alternatives.” Cooey (Biros), 589 F.3d at 220. In any event, the only available alternative that Beuke submits is Plan A, which is the default method for execution. Similarly to the defendant in Biros, Beuke does not argue that he has difficult-to-access veins, and Plan B “comes into play only when an IV injection [under Plan A] is not possible.... That reality alone diminishes the alleged risks.” Id. at 229. And Plan B’s entire purpose is to minimize any difficulties encountered during the use of Plan A. See id. at 222 (“the purpose of the intramuscular injection seeks to avoid an unduly prolonged search for difficult-to-access veins and to provide a safe, non-IV lethal injection method”). There has been no showing *945 that this substitute method is more likely to result in severe pain than continuing with increasingly lengthy attempts at IV injection under Plan A.
But Beuke maintains that the district court erred by focusing solely on the likelihood that he would suffer severe pain if subjected to the protocol of Plan B. Beuke argues that the district court failed to consider whether he had demonstrated that the use of Plan B creates an “objectively intolerable risk of harm” that is “substantial when compared to the known and available alternatives.” Id. at 215.. Beuke fares no better with this argument.
The district court did not specifically explain which of the two phrases — “risk of severe pain” or “objectively intolerable risk of harm” — it was focusing upon in its analysis, but it is true that it appears to focus more particularly on the risk of severe pain. And this is understandable, given that at the hearing, much of the testimony was directed at the potential for Beuke to experience possible side effects from the hydromorphone, such as nausea and vomiting. Nevertheless, we will also review the evidence specifically to determine whether it compels a finding that Plan B presents an “objectively intolerable risk of harm.”
A threshold question, then, is what is the “harm” that is being referenced? It surely cannot be an inmate’s ultimate death, as that is the intended consequence of any execution protocol. Beuke argues that the risk of harm that is objectively intolerable is the likelihood that his response to midazolam would result in a lessened sedative effect, i.e., a sedative effect less than he would experience from the same dosage of midazolam if he had not been taking his anti-seizure medication, with the concomitant result that he would experience the effects of the hydromorphone more acutely. {See Beuke’s Br. at 12). However, neither of Beuke’s experts — not Dr. French, nor Dr. Heath— could quantify the extent of any tolerance of the midazolam Beuke may have. All that was demonstrated was that it was likely that Beuke would have some elevated level of tolerance. Of course, as we have already pointed out, the experts testified that the increased tolerance level would not itself cause any discomfort. This lack of quantification of even the extent of Beuke’s potential tolerance to the Plan B drugs, not to mention the lack of quantification of the likelihood of Beuke’s experiencing any uncomfortable side effects from the hydromorphone, renders unsustainable his argument that he has demonstrated an “objectively intolerable risk of harm.” Mere likelihood of an increased tolerance to the Plan B sedative, which may possibly lead in turn to Beuke’s experiencing uncertain but potentially uncomfortable side effects from the hydromorphone is not a risk of harm which is either objective or intolerable.
Beuke also challenges the Plan B protocol as violative of his right to a “quick and painless death” that arises under Section 2949.22(A) of the Ohio Revised Code. He argues that even though this interest arises under state law, it is nonetheless protected as a right under the due process clause of the Fourteenth Amendment. The district court did not directly address this argument; however, it is foreclosed by our decision in Biros. There, we specifically noted that Section 2949.22 “creates no cause of action to enforce any right to a quick and painless death.” Cooey (Biros), 589 F.3d at 234 (citing State v. Rivera, 2009 WL 806819, at *7 (Ohio Ct.App. Mar. 30, 2009)). And we noted that we were unpersuaded by assertions that § 2949.22 creates a federal right protected by the Fourteenth Amendment. Id. We remain unpersuaded.
*946 We agree with the district court that Beuke has failed to demonstrate any likelihood of success on the merits of his claim that use of the Plan B procedure would violate his Eighth Amendment rights. And we conclude that he has also failed to demonstrate any likelihood of success on the merits of his claim that the procedure would violate any right protected by the Fourteenth Amendment. Because Beuke cannot make any showing that he has any likelihood of success, we find the first factor dispositive. See Workman v. Bredesen, 486 F.3d 896, 911 (6th Cir.2007). Nonetheless, we note that Beuke has not established any of the other factors. He cannot show that he would be irreparably harmed by failure to stay the execution because he has provided no evidence that he will ever be subjected to Plan B, the only part of the Ohio execution protocol to which he objects. And both the third and the fourth factors weigh against granting the stay. The state has a “significant interest in meting out a sentence of death in a timely fashion,” Nelson v. Campbell, 541 U.S. 637, 644, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004), and, as the Supreme Court has repeatedly held, a compelling interest in ensuring the finality of its judgments. See McCleskey v. Zant, 499 U.S. 467, 491, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (“Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power to a State to pass laws means little if the State cannot enforce them.”) “To unsettle these expectations is to inflict a profound injury to the ‘powerful and legitimate interest in punishing the guilty,’ an interest shared by the State and the victims of crime alike.” Calderon v. Thompson, 523 U.S. 538, 556, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) (quoting Herrera v. Collins, 506 U.S. 390, 421, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)). Importantly, these cases make this point in the context of habeas corpus review; how much more must this principle be respected when a last-minute stay of execution is sought in the context of a § 1983 action.
III.
“While the absence of any meaningful chance of success on the merits suffices to resolve this matter,” Workman, 486 F.3d at 911, a final point should be made about the nature of Beuke’s request for a stay of execution: “a stay is an equitable remedy, and equity must take into consideration the State’s strong interest in proceeding with its judgment.” Nelson, 541 U.S. at 649, 124 S.Ct. 2117. Even if Beuke had stated a cognizable § 1983 claim, “the mere fact that an inmate states a cognizable § 1983 claim does not warrant the entry of a stay as a matter of right.” Id. In fact, “in considering the equitable remedy of staying an execution, ‘a district court must consider ... the extent to which the inmate has delayed unnecessarily in bringing the claim.’ ” Workman, 486 F.3d at 911 (quoting Nelson, 541 U.S. at 649-50, 124 S.Ct. 2117). “There is ‘a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.’ ” Id. (quoting Nelson, 541 U.S. at 650, 124 S.Ct. 2117).
While Beuke’s delay may not be as egregious as that of the defendant in Workman, it nonetheless “could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.” Beuke has been taking anti-seizure medication for several years. Ohio’s revised method of execution that includes Plan B as a back-up was instituted in November 2009. Beuke’s current execution date of May 13, 2010, was also set in November 2009. Nevertheless, he waited until March 17, 2010, to move the district court to intervene and, waited until *947 only one week prior to his execution date to amend his complaint to bring the particularized challenges to Plan B that he is currently asserting on appeal. This constitutes unnecessary delay, and Beuke has failed to overcome the “strong equitable presumption” against the grant of his stay request.
Finally, “[i]n the alternative, Beuke respectfully requests that a single judge on this Court expeditiously issue a stay enjoining his execution [pending] his appeal of the District Court’s decision to denying [sic] him relief[,] pursuant to Federal Rule of Appellate Procedure 8(a)(2)(A)(ii) and 8(2)(D).” This alternative relief is wholly unavailable here. The purpose of a single-judge stay is to provide potential relief when the panel to which the appeal is assigned is not available to consider the merits of the claim. In a case such as this, where the panel is not only available to consider but in fact has considered the merits of the case, Rule 8(a)(2)(D) is simply inapplicable.
IV.
For the foregoing reasons, we AFFIRM the judgment of the district court, and we DENY the motion for injunctive relief.

. Beuke also asserted a claim in his amended complaint that because of the drug interaction, he will not be competent to be executed when his execution is imminent, in violation of standards set out in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). He did not focus on such a claim in the district court hearing, and he does not raise it on appeal. It is deemed waived.