*1281 MARTIN, Circuit Judge,
concurring:
Under Glossip v. Gross, — U.S. -, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015), Gissendaner v. Comm’r, Ga. Dep’t of Corr., 803 F.3d 565 (11th Cir.2015) (per curiam), and Wellons v. Comm’r, Ga. Dep’t of Corr., 754 F.3d 1260 (11th Cir.2014) (per curiam), I am compelled to agree that the District Court did not abuse its discretion in denying Mr. Terrell’s motion for temporary restraining order and stay of execution. I share Judge Jordan’s view, however, that Gissendaner was wrongly decided. See Gissendaner, 803 F.3d at 576-81 (Jordan, J., dissenting).
The Eighth Amendment to the U.S. Constitution forbids methods of execution that present “a substantial risk of significant harm.” Baze v. Rees, 553 U.S. 35, 50, 128 S.Ct. 1520, 1531, 170 L.Ed.2d 420 (2008) (plurality opinion) (quotation omitted); see also Glossip, 135 S.Ct. at 2737. In this regard, the standard set for a death row inmate to bring a successful method-of-execution challenge is quite demanding.
Mr. Terrell now presents us with such an Eighth Amendment cruel and unusual punishment claim alleging the risk of future harm. For this claim, precedent requires him to show “the conditions presenting the risk must be ‘sure or very likely to cause serious illness and needless suffering,’ and give rise to ‘sufficiently imminent dangers.’ ” Baze, 553 U.S. at 50, 128 S.Ct. at 1530-31 (quoting Helling v. McKinney, 509 U.S. 25, 33, 34, 113 S.Ct. 2475, 2480, 2481, 125 L.Ed.2d 22 (1993) (emphasis added)); see also Glossip, 135 S.Ct. at 2737. Beyond that, in the lethal injection context, this standard requires an inmate to show an “objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment.” Glossip, 135 S.Ct. at 2737 (quotation omitted). And in any event, “[a] stay of execution may not be granted” pursuant to a method-of-execution challenge “unless the condemned prisoner establishes that the State’s lethal injection protocol creates a demonstrated risk of severe pain. [And][h]e must show that the risk is substantial when compared to the known and available alternatives.” Id. (alteration in original) (quoting Baze, 553 U.S. at 61, 128 S.Ct. at 1537). Thus Mr. Terrell faces a substantial hurdle in getting the relief he now asks us to give him.
At the same time Mr. Terrell faces this heavy burden in federal court, the State of Georgia has made critical aspects of its execution procedure a “confidential state secret.” Ga.Code Ann. § 42-5-36(d)(2).[1] Georgia’s secrecy rules being what they are, I do not see how Mr. Terrell could ever get the information necessary to state an Eighth Amendment claim about lethal injection. The shroud of secrecy imposed by Georgia law effectively insulates the State of Georgia’s source, quality, and composition of pentobarbital from any scrutiny, leaving the condemned without any meaningful notice or opportunity to be heard about the specific risks he faces from the State’s reliance on an unidentified compounding pharmacy. This leaves Mr. Terrell with no ability to plead facts neces *1282 sary to meet the demanding burden the law imposes on him.
I am equally concerned about this Court’s ability to meaningfully discharge its constitutional duty to assess the risks associated with Mr. Terrell’s execution against relevant Eighth Amendment standards. While Georgia’s pleadings offer assurance that the production of the drugs which will be used to execute Mr. Terrell will work fine, Georgia’s pleadings do not constitute evidence. Indeed, we have no reliable evidence by which to independently evaluate the safety and efficacy of the State of Georgia’s secret drugs.[2] For me, this raises serious due process concerns. Cf. Ford v. Wainwright, 477 U.S. 399, 414, 106 S.Ct. 2595, 2604, 91 L.Ed.2d 335 (1986) (“[Consistent with the heightened concern for fairness and accuracy that has characterized our review of the process requisite to the taking of a human life, we believe that any procedure that precludes the prisoner or his counsel from presenting material relevant to his sanity or bars consideration of that material by the factfinder is necessarily inadequate.”); Solesbee v. Balkcom, 339 U.S. 9, 23, 70 S.Ct. 457, 464, 94 L.Ed. 604 (1950) (Frankfurter, J., dissenting) (“And the minimum assurance that the life-and-death guess will be a truly informed guess requires respect for the basic ingredient of due process, namely, an opportunity to be allowed to substantiate a claim before it is rejected.”).
Of course, I recognize the State’s need to obtain a reliable source for its lethal injection drugs. But there must be a way for Georgia to do this job without depriving Mr. Terrell and other condemned prisoners of any ability to subject the State’s method of execution to meaningful adversarial testing before they are put to death. A defendant cannot have received due process when he must wait for a botched execution, or other mishap, in order to get sufficient information to satisfy Glossip and vindicate his Eighth Amendment rights. Federal courts routinely construct procedures in other areas of the law (in the grand jury setting or in proceedings involving commercial trade secrets, for example) to protect one side’s legitimate privacy interests and at the same time guard the Constitutional rights of the other. The procedure that now exists in Georgia for preparing lethal injection drugs accomplishes the former at the expense of the latter. Surely, if we can protect grand *1283 jury proceedings and commercial trade secrets, we can come up with a process that protects the important interests of both Georgia and Mr. Terrell as the State carries out the “gravest sentence our society may impose.”[3] Hall v. Florida, — U.S. -, -, 134 S.Ct. 1986, 2001, 188 L.Ed.2d 1007 (2014).

. Section 42-5-36(d)(2) of the Georgia Code states:
The identifying information of any person or entity who participates in or administers the execution of a death sentence and the identifying information of any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence shall be confidential and shall not be subject to disclosure under Article 4 of Chapter 18 of Title 50 or under judicial process. Such information shall be classified as a confidential state secret.
Ga.Code. Ann. § 42-5-36(d)(2).

. For example, the parties dispute the reasons why the pentobarbital that was compounded for Ms. Gissendaner's execution on March 2, 2015 went bad, or as the parties say, “precipitated.” Relying on Dr. Jason Zastre, the State says "the most likely cause of precipitation observed within the solution was that the solution was shipped and stored at a temperature which was too low. An additional possible cause could be if the pharmaceutical solvent used to dissolve the pentobarbital had absorbed some amount of water or evaporated during the preparation process.” In contrast, Mr. Terrell believes the cold-storage theory “for why two batches of their pharmacist's drugs congealed has been disproven by [the Georgia Department of Corrections’s] own testing,” and he argues that the Department of Corrections has still not determined the cause of the precipitation problem, which makes it likely to recur. Terrell’s most troubling allegation "is that the defects in the means or method by which Defendants’ pharmacist mixes these drugs would not always manifest themselves in a readily visible way,” despite hourly visual observations by the Department of Corrections on the day of execution. According to Mr. Terrell’s expert, Dr. Michael Jay, "a compounded formulation could have a dangerous pH level or be polluted, with contaminants, but would not display any outward manifestations of its internal flaws.” See also Gissendaner, 803 F.3d at 579 (Jordan, J., dissenting) (noting there is "no guarantee that a doctor or pharmacist will recognize the problem the next time, particularly if the compounded pentobarbital has an incorrect pH or is, despite its adulteration, only slightly cloudy”).

. For example, district courts use protective orders to prescribe discovery methods that protect the State's interest in'secrecy while providing the defendant and his expert(s) a meaningful opportunity to assess the relevant Eighth Amendment risks. See Fed.R.Civ.P. 26(c)(1); cf. Pennsylvania v. Ritchie, 480 U.S. 39, 60, 107 S.Ct. 989, 1002-03, 94 L.Ed.2d 40 (1987) (recognizing that where a conflict exists between a State’s assertion of confidentiality in a criminal trial and a defendant's right to due process, records may be submitted to the trial court for in camera review).